UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

**LUZ MARY VALDES**                              Case No.: 16-26255-LMI

Chapter 7 Debtor

_____/

**MONEYGRAM PAYMENT SYSTEMS, INC.,**    Adv. Case No.:

Plaintiff,

v.

**LUZ MARY VALDES**,

Defendant.

_____/

<u>**COMPLAINT TO DETERMINE**</u>
<u>**NON-DISCHARGEABILITY OF DEBT**</u>

The Plaintiff, MoneyGram Payment Systems, Inc., ("MoneyGram"), sues Defendant, Luz

Mary Valdes, ("Debtor") and alleges:

1.      This is an adversary proceeding to determine the non-dischargeability of a debt

pursuant to 11 U.S.C. § 523(a).

2.      This is a core proceeding over which this Court has jurisdiction pursuant to 28

U.S.C. § 157.  Plaintiff does consent to the entry of final orders or judgment by the bankruptcy

court.  Venue is proper in this District pursuant to 28 U.S.C. § 1409(a), as this proceeding arises

and relates to a case under the Bankruptcy Code pending in this District.

3.      At all times material to this complaint, Defendant owned and operated Luz Fashions

Import and Sales, Inc. ("Luz Fashions"), a Florida Corporation.

4.      Plaintiff contracts with persons and entities such as Luz Fashions and Defendant to

provide services including, but not limited to, money transfer services and the sale of money orders

to the general public (referred to collectively as the "Services").  Such persons or entities hold the

funds collected from the sales of the Services for Plaintiff, earning fees from the same.

5.      On or about September 11, 2014, Plaintiff entered into such a contract with Luz

Fashions and Defendant, by and through a Master Trust Agreement (hereafter the "Agreement")

dated September 11, 2014 and executed by Defendant, as President of Luz Fashions.

6.      Pursuant to the Agreement, MoneyGram authorized Luz Fashions, as "Trustee", to

offer and sell the Services in consideration for MoneyGram's agreement to pay Luz Fashions a set

fee or percentage fee of the monetary value of a particular Service.  A true and correct copy of the

Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

7.      Under the Agreement, Luz Fashions agreed to hold in trust, for the benefit of

MoneyGram, any and all proceeds related to the sale of the Services (the "Trust Funds") and to

maintain a separate account to hold such Trust Funds:

> "Trust Funds" are fees, face amounts of money orders, gift
> certificates, money transfer checks, principal amounts of
> utility bill payments and money transfers and all proceeds
> from the sale of the Services. Trustee agrees to hold Trust
> Funds in  trust for Company and separate from  Trustee's
> funds ....Trustee shall maintain an account to hold the Trust
> Funds [the "Trust Account"]." *See Exhibit A, para. 2.*

8.      Luz Fashions, further agreed in the Agreement that:

> Trustee will safeguard the Trust Funds and all Supplies
> [including  blank  instruments] with the highest degree of
> care and will take such precautions as a  prudent  Trustee
> would take to safeguard its own cash. *See Exhibit A, para.
> 5(a) and 6.*

and that:

> "Trustee is liable to pay to Company all Trust Funds in

all circumstances. Until good funds are received by the Company, Trustee is liable for any lost, missing or stolen Trust funds, whether or not Trustee is negligent or at fault and regardless of how the trust funds became lost, missing or stolen." *See Exhibit A, para. 5(b).*

9.     In further consideration of the Agreement, Defendant executed and delivered a Personal Indemnity and Guaranty to MoneyGram ("the Guaranty") personally, absolutely, unconditionally and irrevocably guaranteeing the punctual performance of all obligations of every kind, nature and description of Trustee, whether now existing or hereafter arising, under the Agreement.  A true and correct copy of the Guaranty is contained within and is a part of the Agreement, attached as Exhibit "A".

10.    As described above, pursuant to the Agreement, Luz Fashions and Defendant were to hold the Trust Funds in trust for the benefit of MoneyGram. The Agreement required Luz Fashions and Defendant to remit to MoneyGram, on a daily basis, all Trust Funds.

11.    Defendant wrongfully withheld ONE HUNDRED SEVENTEEN THOUSAND FIVE HUNDRED THIRTY  TWO AND 03/100 DOLLARS ($117,532.03) in breach of the Agreement and Guaranty, comprising proceeds from the sale of Services that were required to be deposited in the Trust Account pursuant to the Agreement, as well as audit and return fees.  A copy of the Summary of Statement of Account, which is a systematic record of the Services provided is attached Exhibit "B".

12.    As a result of Defendant's failure and refusal to pay MoneyGram the Trust Funds in the amount of $117,532.03, Plaintiff filed a complaint against Luz Fashions and Defendant in Miami-Dade County Circuit Court (Case Number: 16-001966-CA-01) on January 26, 2016.

13.    On February 10, 2016, Plaintiff filed an Amended Complaint.  A copy of the Amended Complaint is attached as Exhibit "C".

14.    On July 27, 2016, MoneyGram obtained a default judgement against Luz Fashions and Defendant, jointly and severally, in the amount of $123,201.40, with interest accruing at the statutory rate.  A copy of the default judgement is attached as Exhibit "D".

15.    On December 7, 2016 ("Petition Date"), Debtor filed a voluntary petition for Chapter 7 bankruptcy relief [main case ECF #1].

16.    Within Debtor's bankruptcy schedules, the Debtor listed MoneyGram as an unsecured creditor on Schedule F in the amount of $0.00.

## COUNT I

### Objection to Dischargeability- 11 U.S.C. §523(a)(4)

### (Fraud or Defalcation While Acting in Fiduciary Capacity)

17.    The allegations re-alleges paragraphs 1 through 16 above as if fully set forth herein.

18.    Plaintiff's claim against Debtor is for a debt that arose as a result of fraud or defalcation while acting in a fiduciary capacity.

19.    While acting as Trustee for trust funds held on behalf MoneyGram, Debtor knowingly used the trust funds with the intent, either temporarily or permanently, to appropriate the funds for use by Debtor's corporation without consent of the Plaintiff or for the Debtor's own use.

20.    Despite Plaintiff making repeated requests and demands for return of the trust funds, Debtor has failed to properly account for the disposition of the trust funds and return the funds to MoneyGram.

**WHEREFORE,** Plaintiff seeks the entry of a judgment determining that the referenced debt to Plaintiff, as well as the related attorneys' fees and costs incurred by Plaintiff in prosecuting these claims are not dischargeable and granting such other relief as is just and proper.

## COUNT II

### Objection to Dischargeability- 11 U.S.C. §523(a)(4)

### (Embezzlement)

21.  The allegations re-alleges paragraphs 1 through 16 above as if fully set forth herein.

22.  While acting as Trustee for trust funds held on behalf MoneyGram, Debtor knowingly used the trust funds with the intent, either temporarily or permanently, to appropriate the funds for use by Debtor's corporation without consent of the Plaintiff or for the Debtor's own use.

23.  Despite Plaintiff making repeated requests and demands for return of the trust funds, Debtor has failed to properly account for the disposition of the trust funds and return the funds to MoneyGram.

**WHEREFORE,** Plaintiff seeks the entry of a judgment determining that the referenced debt to Plaintiff, as well as the related attorneys' fees and costs incurred by Plaintiff in prosecuting these claims are not dischargeable and granting such other relief as is just and proper.

## COUNT III

### Objection to Dischargeability- 11 U.S.C. §523(a)(6)

### (Willful and Malicious Injury)

24.  The allegations re-alleges paragraphs 1 through 16 above as if fully set forth herein.

25.  Debtor knew, or was substantially certain, that injury to Plaintiff was substantially likely certain to occur.

26.  Debtor wrongfully deprived Plaintiff of the use and benefit of the trust funds.

27.  Despite Plaintiff making repeated requests and demands for return of the trust funds, Debtor has failed to properly account for the disposition of the trust funds and return the funds to MoneyGram.

**WHEREFORE,** Plaintiff seeks the entry of a judgment determining that the referenced debt to Plaintiff, as well as the related attorneys' fees and costs incurred by Plaintiff in prosecuting these claims are not dischargeable and granting such other relief as is just and proper.

Dated: March 12, 2017.

The Salkin Law Firm, P.A.
Attorneys for MoneyGram
950 South Pine Island Road #A-150
Plantation, Florida 33324
Telephone        954-423-4469
FAX                954-423-4479

By: */s/ Sonya Salkin*
  Sonya Salkin
  FBN 603910
  sonya@msbankrupt.com

# "Exhibit A"

Process ID:        564158

 MoneyGram.

**MASTER TRUST AGREEMENT**
Legal
MGI 1003PE (07/2013)

This Master Trust Agreement ("**Agreement**") is between each Trustee that signs this Agreement and its Affiliates ("**Trustee**") and MoneyGram Payment Systems, Inc. ("**Company**" or "**MoneyGram**"). As used herein, "**Affiliate**" means any business controlling, controlled by, or under common control with Trustee.

1.    **Appointment and Acceptance; No Sub-Agents; Agent Locations.**

   (a)    Company hereby appoints Trustee as its limited agent and authorized delegate for the sole purpose of offering and selling Company's products and services (the "**Services**"), all in accordance with Applicable Law, this Agreement (including any applicable attachments, addenda, schedules, and/or exhibits) and Company's requirements to offer the Services. Trustee hereby accepts such appointment. Trustee will not authorize or appoint sub-agents or sub-delegates to offer or sell any Services.

   (b)    Trustee shall offer and sell the Services at all of Trustee's locations, as authorized by Company, including without limitation the locations identified on <u>Exhibit 1 – Authorized Agent Location(s)</u> (the "**Agent Location(s)**"). The Agent Locations may only be changed subject to Company's prior approval. Trustee agrees to provide the Services during the business hours of the Agent Locations. Trustee agrees to notify Company of the business hours for each Agent Location.

2.    **Trust Relationship.** "**Trust Funds**" are proceeds from the sale of Services including, but not limited to, Consumer Fees, face amounts of money orders, gift certificates, DeltaGrams (if applicable, and as defined in the Money Transfer Attachment), principal amounts of bill payments, money transfers and debit or pre-paid card purchases, loads or reloads. Trustee agrees to hold Trust Funds in trust for Company and separate from Trustee's funds. If Trust Funds become commingled with Trustee's other funds, the total commingled funds are impressed with a trust and shall belong and are payable to Company to the extent of amounts due Company from Trustee. During the Term, Trustee shall maintain an account to hold the Trust Funds as set forth in the <u>ACH Pre-Authorization Form and Authorization Agreement</u> (the "**Trust Account**"). Trustee will provide at least sixty (60) days' notice to Company before changing the Trust Account and will not change the Trust Account until similar arrangements have been made for another Trust Account.

3.    **Legal Compliance.**

   (a)    <u>General.</u>

      (i)    Each party shall comply with Applicable Law. Trustee acknowledges and understands that by offering the Services, it is subject to the supervision, examination, and regulation of any applicable Regulatory Body (as defined hereafter), including those with oversight for money transmission and money services businesses. Trustee is in compliance with, and will during the Term comply with, Applicable Law, including the state-specific provisions attached as <u>Exhibit 2 – Multi-State Regulatory Addendum</u> (as updated by MoneyGram from time to time only as required by Applicable Law; provided that Trustee has reasonable notice for compliance for such updates). Trustee will conduct its money transmission activities strictly in accordance with any applicable compliance guidelines issued pursuant to Applicable Law. If applicable, Trustee will display at each Agent Location any signs, decals, and other display and disclosure materials provided to Trustee by Company that is required to be posted pursuant to any Applicable Law relating to Trustee's offering of the Services. Trustee understands that if Trustee exceeds the authority granted under this Agreement, this Agreement is subject to immediate termination, and Trustee may be subject to further disciplinary actions by the relevant regulator. Trustee acknowledges that it has an independent and ongoing obligation to comply with Applicable Law and that it shall only offer the Services in accordance with Applicable Law and in accordance with Company's instructions, policies and procedures, as such may be updated from time to time by Company (the "**MoneyGram Compliance Policies**"). Trustee also acknowledges that this obligation is in no way reduced, altered, assigned or transferred by any assistance that may or may not be provided by Company.

      (ii)    As used in this Agreement, "**Applicable Law**" means (i) any U.S. federal, state, local or other law or statute (which includes any applicable state statutes included in the state specific provisions attached as <u>Exhibit 2 -- Multi-State Regulatory Addendum</u>); (ii) any rule or regulation issued by a Regulatory Body, including the Financial Crimes Enforcement Network and the Office of Foreign Assets Control of the United States Treasury Department; (iii) any judicial, governmental, or administrative order, judgment, decree or ruling; and (iv) the Network Rules (as defined hereafter), in each case as applicable to either party, its Affiliates or the subject matter or transactions contemplated by this Agreement. "**Regulatory Body**" means any governmental authority with jurisdiction over a party or its Affiliates, including those with oversight for money transmission and money services businesses; and "**Network Rules**" means the by-laws, operating rules, regulations and guidelines and technical standards promulgated from time to time by any organization that operates computer hardware and software and telecommunications links to enable the interchange, under a common service mark, of electronic fund transfers (including, without limitation, Visa, MasterCard, or NACHA) among the participants in the organization, including the credit card association's Payment Card Industry Data Security Standards.

   (b)    <u>Anti-Money Laundering Compliance.</u> Upon execution of this Agreement, Trustee certifies and represents to Company that it is in compliance with, and will, during the Term (as defined hereafter), maintain its compliance with all relevant requirements of

Process ID:        564158

Applicable Law relating to anti-money laundering (the "**AML Requirements**") and the MoneyGram Compliance Policies. The AML Requirements specifically include the Bank Secrecy Act (the "**BSA**"), as amended by the USA Patriot Act and their respective requirements including, but not limited to, the filing of currency transaction reports ("**CTR**"), record-keeping and suspicious activity reporting ("**SAR-MSB**"), measures to identify potentially suspicious activity, including the establishment of a program to monitor and investigate activity that may be consistent with money laundering or other financial crime, registration as a money services business with the U.S. Treasury Department if Trustee is offering products or services, other than the Services, that require such registration, adoption of a written compliance program, designation of an anti-money laundering ("**AML**") compliance officer, implementation of effective AML training for all appropriate personnel and periodic independent reviews of its AML compliance program. Trustee shall complete and, if applicable, file any forms or reports, including without limitation, CTRs or SAR-MSBs (collectively, the "**Compliance Reports**") when required by Applicable Law. Trustee agrees to retain and secure all Compliance Reports, in a manner consistent with Applicable Law, for a period of at least five (5) years, or longer as may be required by Applicable Law (the "**Retention Period**"). Upon termination of this Agreement for any reason, Trustee agrees to preserve any completed Compliance Reports for the required Retention Period, at which point the Compliance Reports shall be properly destroyed in a manner consistent with Applicable Law. At any time during the Term or during the Retention Period, Company, in its sole discretion, may request Trustee to provide completed Compliance Reports to Company.

(c) <u>Consumer Fraud and Abuse Prevention</u>. Trustee understands that Company is committed to preventing the use by anyone of Company's products and services, including the Services, for fraudulent, abusive or illegal purposes. Trustee acknowledges that Company has developed, and will continue to develop, various policies, procedures and requirements designed to limit, prevent and deter such fraudulent or abusive transactions and to assist individuals who have been victimized by such fraudulent activity (the "**MoneyGram Fraud Policies**"). Trustee agrees to comply with the MoneyGram Fraud Policies and that at no time may Trustee use the Services for the purpose of committing fraud upon consumers or against Company including, but not limited to, the deception of individuals through telemarketing or through some other similar plan, program or campaign conducted to induce the purchase of goods or services by use of the telephone or the internet. Trustee further agrees not to provide any substantial assistance or support to any individual or entities that Trustee knows or reasonably suspects engages in such acts or acts in a manner that may violate the MoneyGram Fraud Policies. As part of the MoneyGram Fraud Policies, Trustee acknowledges that Company will monitor (i) all transactions conducted by Trustee or conducted at a specific Agent Location; and (ii) feedback or other information received by consumers with regard to transactions that occurred with the Trustee or at an Agent Location. Trustee agrees that at any time that it offers the Services it will maintain effective policies, procedures and requirements of its own that are also designed to detect and prevent consumer fraud or abusive transactions.

(d) <u>Anti-Corruption Warranties</u>. Trustee makes the following additional representations and warranties to Company with the understanding that Company is relying on them in the entering of this Agreement: (i) Trustee has not and will not make any payment or transfer anything of value, directly or indirectly (1) to any governmental official or employee (including employees of a governmental corporation or public international organization) or to any political party, party official or candidate for public office (the foregoing, collectively, "**Government Official**") or (2) to any other person or entity if such payments or transfers would violate the laws of the country in which made or the laws of the United States; (ii) no government official has any legal or beneficial interest, direct or indirect, in any payment to be made by Company under this Agreement; (iii) neither Trustee nor any shareholder, director, officer, employee or agent of Trustee is a Governmental Official, political party official or candidate for political office; (iv) Trustee has reviewed and agrees to abide by MoneyGram's Anti-Corruption Policy; (v) Trustee has adopted an anti-corruption policy which at a minimum, prohibits the direct or indirect offer, authorization, or payment of money or anything of value to improperly influence a Government Official, (vi) Trustee agrees that if subsequent developments cause the representations and warranties made herein to no longer be accurate or complete, Trustee will immediately so advise Company; and (vii) Trustee agrees that the agreement is subject to immediate termination in the event that Trustee breaches the representations identified in this paragraph (d).

(e) <u>Cooperation</u>. Trustee agrees to cooperate reasonably with Company in relation to Trustee's performance of the Services in accordance with Applicable Law. Such cooperation shall include, but not be limited to, cooperation with Company's investigation of potential suspicious activity, assisting Company in complying with Company's record-keeping and/or reporting obligations under the AML Requirements, and assisting Company in obtaining other relevant information and records about Trustee. Trustee acknowledges that, due to the nature of the suspicious activity or the transactions, Company may not be able to provide to Trustee detailed information relating to such activity or transactions, but will do so when Company determines is appropriate under the circumstances and if allowed by Applicable Law. Additional actions requested by Company for Trustee to perform may include following instructions described in the MoneyGram Compliance Policies, the MoneyGram Fraud Policies, the MoneyGram Anti-Corruption Policy, the Company user guides, fraud and money laundering prevention guides, fraud alert memos, correspondence, and various other communications, each as may be updated from time to time.

(f) <u>Remedial Measures</u>. Notwithstanding any provision to the contrary, Company shall have sole discretion to determine whether Trustee has breached or violated any of the MoneyGram Compliance Policies, the MoneyGram Fraud Policies, the MoneyGram Anti-Corruption Policy, or if it suspects any fraudulent, illicit or illegal activity of Trustee or a specific Agent Location. In the event Company suspects such a breach or violation, or suspects that fraudulent, illicit or illegal activity has been conducted or facilitated by Trustee or has taken place at an Agent Location, Trustee acknowledges that Company may take one or more of the following actions: (i) immediate termination of this Agreement and suspension of any further obligations of Company to the Trustee; (ii) imposition of Remedial Measures (as defined hereafter) as identified by Company; or (iii) suspension of transactions until Company determines remedial controls have been implemented by Trustee. As used herein, "**Remedial Measures**" include, but are not limited to (1) lowering the threshold at which the Trustee or specific Agent Location will obtain, verify and record customer identification; (2) imposing volume or transactional limits or restrictions to financial activity that Trustee or the

Agent Location may conduct; and (3) requiring Company review and approval of transactions above a certain amount before they may be executed by Trustee.

(g)     Audit and Review. Trustee authorizes Company to visit, interview, inspect and review Trustee's records related to its offering of the Services, including Trustee's compliance, training, customer and transactional records, to determine Trustee's compliance with Applicable Law (including the AML Requirements), the MoneyGram Compliance Policies, the MoneyGram Fraud Policies, and the MoneyGram Anti-Corruption Policy.  Trustee agrees to notify Company within 24 hours if the Trustee or any of its employees engaged in the performance of this Agreement or its directors, officers, or any customer of the Trustee (including customers of Company who purchase Services at the Agent Location) is the subject of a criminal investigation involving money laundering, terrorism, fraud or other financial crime.  When permitted by Applicable Law, Trustee agrees to notify Company promptly and in writing, no later than thirty (30) days after Trustee's receipt of any final adverse state or federal examination report or findings, and provide a copy of the report or findings.  Trustee acknowledges that it is required to conduct an independent review of its AML compliance program to determine its effectiveness.  Trustee agrees to provide Company with a copy of this review (including any responses to the report or reports indicating remedial steps Trustee is required to take to correct or enhance its compliance program) upon reasonable request by Company.

(h)     Overriding Principles. Notwithstanding any other provision of this Agreement:

(i)     In no event shall either party or any of its Affiliates be required to take any action, or omit to take any action, that would cause it to violate Applicable Law or cause it to limit its ability to control the occurrence of any fraudulent transactions;

(ii)    In no event shall Company be required to take any action, or omit to take any action, that would cause it to violate the terms of any MoneyGram License. As used herein, a **"MoneyGram License"** means the terms and conditions of any regulatory approval, charter or license to engage in the money transmission business held by Company or any of its Affiliates; and

(iii)   Each Party will take all reasonable measures to prevent Company products and services from being used to facilitate money laundering, terrorism, fraud or any other financial crime.

4.     **Training.** Prior to offering any Services, Trustee shall ensure that it and its employees, representatives, contractors, and Affiliates involved in the performance of this Agreement are knowledgeable and have been appropriately trained in the Services, compliance with Applicable Law (including the AML Requirements), and the prevention of money laundering, terrorist financing, fraud or any other financial crime. Trustee shall have written policies to carry this forth and shall properly train its employees, representatives, contractors, and Affiliates in all these respects and in the MoneyGram Compliance Policies, the MoneyGram Fraud Policies and the MoneyGram Anti-Corruption Policy. Training of all appropriate personnel shall be conducted at least once a year unless Company reasonably requests more frequent training. Trustee shall undergo any supplemental training required by Company during the Term.  Company will provide telephonic, computer-assisted and/or in-person training to employees of Trustee, as Company determines in its sole discretion is necessary.  Trustee agrees to cooperate in completing training and to provide documentation of such upon Company's request.  There shall be no charge to Trustee associated with such training, except that, in the event Trustee fails to give at least 48 hours notice prior to the cancellation of any scheduled training, Trustee may be required to pay Company's direct expenses associated with such cancellation.

5.     **Duty of Care; Liability.**

(a)     Trustee will safeguard the Trust Funds and all Supplies (as defined below) with the highest degree of care and will take such precautions as a prudent Trustee would take to safeguard its own cash.  Trustee will report to Company by telephone and confirm by fax immediately upon discovery of any lost, stolen, misappropriated, seized or forfeited Trust Funds or Supplies (including money orders and/or DeltaGrams) and shall provide Company with all other information relating to the event (including serial numbers for blank instruments).

(b)     Trustee is liable to pay to Company all Trust Funds in all circumstances.  Until good funds are received by the Company, Trustee is liable for any lost, missing or stolen Trust Funds whether or not Trustee is negligent or at fault and regardless of how the Trust Funds became lost, missing, or stolen.

6.     **Supplies.** Depending on the Services to be offered by Trustee, Company, in its sole discretion, will provide Trustee appropriate automation equipment, including a personal computer or a transaction terminal (the **"Equipment"**), certain proprietary software (the **"Software"**), certain forms, and/or blank instruments (collectively, the Equipment, Software, forms and blank instruments, may be referred to as the "Supplies") for use at the Agent Locations.  Company may deliver the Supplies via any method it deems appropriate in its sole discretion. Supplies remain the property of Company and will be returned immediately upon termination of this Agreement or upon written request of Company.  Trustee shall be responsible for ordering additional Supplies as needed from Company.

(a)     Software. If provided, Company hereby grants Trustee a royalty-free non-exclusive license to use the Software for providing the Services.  Trustee shall not copy or decompile the Software.  All aspects of the Software, including without limitation, programs, methods of processing, modifications and improvements shall remain the sole and exclusive property of Company and shall not be sold, revealed, disclosed or otherwise communicated, directly or indirectly, by Trustee to any third parties.  Trustee shall install and utilize new versions of Software as provided and instructed by Company. At no time during the Term shall Trustee be using a version of the Software that is more than one version behind Company's latest version of the applicable Software.  The license granted under this section shall terminate simultaneously with the termination of this Agreement for any reason.

(b)    Equipment. Trustee is responsible for any loss or damage to Equipment except for ordinary wear and tear. Trustee may not disassemble the Equipment. Trustee will immediately notify Company if Equipment is not working and Company will perform all maintenance. In the event repair is necessary for the Equipment, Company will pay costs to ship its Equipment to and from its service center. Trustee shall not move the Equipment without Company's consent. If Trustee fails to return Equipment within 30 days of termination of any applicable portion of this Agreement, Trustee shall pay the replacement cost of such Equipment. Upon Company's request for Trustee to upgrade its Equipment, Trustee shall return any existing Equipment and will upgrade its Equipment according to Company's policies and procedures.

(c)    Forms. Company agrees to supply to Trustee the forms necessary for Trustee to conduct the Services at the Agent Locations. Trustee agrees to use only the forms instructed and approved by Company for the Services. Trustee shall be responsible for ordering or otherwise obtaining all such forms from Company as needed. The content and format of all forms shall be controlled by Company. Trustee agrees not to alter, amend or supplement the content of the forms. Trustee agrees to retain and keep safe and confidential all forms used in connection with the Services for a period of no less than five (5) years, or longer as required by any Applicable Law or regulation. Trustee agrees to return all forms used in connection with the Services within 10 business days of the termination of this Agreement or applicable attachment for any reason. At any time during the Term, Trustee shall immediately provide Company completed forms related to the Services or copies thereof at Company's request.

(d)    Personnel and Space. Trustee will furnish personnel and space at the Agent Locations necessary for providing the Services. Trustee agrees to install and maintain at its expense telephone lines, data connections, or such other connections required to communicate to Company (collectively, the "**Connections**") and support said Services. Trustee agrees to ensure the availability of the Connections and that these Connections will allow secure communications with Company.

7.    **Confidentiality and Privacy.**

(a)    During the Term, each party shall keep in confidence the other party's Confidential Information, using the same degree of care it uses to protect its own confidential or proprietary information, but in any event no less than reasonable care. Each party also agrees not to use such Confidential Information for any purpose except as contemplated by this Agreement without the other party's prior written consent, and not to disclose any Confidential Information received by it to any third party. As used herein, "**Confidential Information**" means business or technical information, whether oral, audio, visual, written or other form including without limitation information regarding any party involved in the Services, the terms and conditions of this Agreement, any proprietary and training materials and any other information that by its nature is considered proprietary and confidential. Confidential Information does not include information (i) which is already known to the other party when received, (ii) thereafter becomes generally obtainable by a party other than by breach of this Agreement, or (iii) is required by law, regulation or court order to be disclosed by such party, provided that, in the case of this clause, such information remains confidential except to the extent required, and prior notice of such disclosure has been given to the party which furnished such information, when legally permissible, and that efforts to cooperate with a lawful effort to contest the disclosure are made. As used herein, "**Personally Identifiable Information**" means any and all information that could identify an individual (including, but not limited to, an individual's name, address, phone number, e-mail address, social security number, account number, or security key). All data regarding consumers and consumer transactions as well as Personally Identifiable Information which Trustee obtains as a result of offering the Services is the property of Company and shall be regarded, safeguarded, and maintained as Company's Confidential Information. The confidentiality obligations under this section shall survive any termination of this Agreement.

(b)    Trustee warrants that it has developed, implemented, and will maintain effective information security policies and procedures (the "**Information Policies**"). Trustee warrants that the Information Policies include administrative, technical and physical safeguards designed to (i) insure the security and confidentiality of Confidential Information provided to it by Company or Company's customers; (ii) protect against anticipated threats or hazards to the security or integrity of such Confidential Information; (iii) protect against unauthorized access or use of such Confidential Information; (iv) ensure the proper disposal of Confidential Information; and (v) comply with applicable industry or association rules or standards such as the credit card association's Payment Card Industry Data Security Standards.

(c)    Trustee warrants that all personnel handling such Confidential Information have been appropriately trained in the implementation of the Information Policies and that it regularly audits and reviews the Information Policies to ensure their continued effectiveness and determine whether adjustments are necessary in light of circumstances including, without limitation, changes in technology, customer information systems or threats or hazards to Confidential Information. Trustee shall, and shall ensure that its employees, agents and subcontractors, take adequate technical and organizational security measures to safeguard Personally Identifiable Information and other Confidential Information against unauthorized access, destruction, disclosure, transfer, or other improper use. Trustee shall not, and shall not authorize any third party to (i) process any Personally Identifiable Information and/or Confidential Information, or (ii) transfer any Personally Identifiable Information and/or Confidential Information to another jurisdiction, for any purpose other than the performance of this Agreement. In the event of any unauthorized access to Company's Confidential Information and/or Personally Identifiable Information, Trustee shall promptly notify Company of such unauthorized access and take appropriate action to prevent further unauthorized access. Trustee will cooperate with Company and pay all related expenses, provide any notices and information regarding such unauthorized access to appropriate law enforcement agencies and government regulatory authorities. In the event that such unauthorized access was due to Trustee's negligence, gross negligence, intentional misconduct or breach of this Agreement, Trustee shall, at its expense and in consultation with the Company, provide Company's affected customers with notice regarding the unauthorized access and

provide access to credit monitoring services, credit protection services, credit fraud alerts, or similar services to which Company, in its sole discretion, deems necessary to protect such affected customers. To the extent Trustee fails to act in accordance with the provisions of this section, or in violation of any applicable data protection laws, Trustee agrees to fully indemnify and hold Company harmless in accordance with the Indemnification section herein.

8.    **Proprietary Material; Signage.**

(a)    **"Company Proprietary Material"** means Company's name, logo, trademarks, service marks, trade secrets, copyrights, patents, programs, processes, and the Company's other intellectual rights and proprietary materials. Trustee acknowledges that Company is the owner of all right, title and interest in and to the Company Proprietary Material. Trustee shall only use the Company Proprietary Material in compliance with Company's written policies and procedures. Trustee shall submit all materials using Company's Proprietary Material or referencing the Services for Company's approval prior to any use for advertising or promotional purposes. Trustee agrees to immediately stop its use of Company Proprietary Material upon expiration or termination of this Agreement or upon receipt of notice to do so from Company. Trustee shall return or destroy, at Trustee's expense, all Company Proprietary Material to Company within fifteen (15) business days after receipt of notice or termination.

(b)    **"Trustee Proprietary Material"** means Trustee's name, logo, trademarks, service marks, trade marks and copyrights. Company acknowledges that Trustee is the owner of all right, title and interest in and to the Trustee Proprietary Material. Company may use Trustee Proprietary Material to promote and advertise the Services and in any Company listing of its agents and locations offering the Services.

(c)    Trustee will prominently display the signs, displays, and/or decals which contain any Company Proprietary Material (the **"Signage"**) at each of the Agent Locations. Trustee shall comply with Company's standard requirements and procedures applicable to the Signage. Such requirements and procedures may be amended from time to time in Company's sole discretion and are made a part hereof, as so amended. Signage must be installed in accordance with the particular Agent Location's zoning regulations, covenants, codes, landlord/lease obligations, and in compliance with any permits or authorizations of any kind that may be required by any governmental authority. Trustee shall be solely responsible for any costs associated with the requirements set forth herein, as well as for any costs incurred in connection with non-compliant, defective or unauthorized installation of the Signage. Trustee shall also be solely responsible for any damage, loss or injury resulting from the installation or removal of the Signage. Company shall supply Trustee the Signage to be displayed at the Agent Locations without charge. Trustee acknowledges that Trustee does not own the Signage and will not assert ownership rights in the Signage. During the Term of this Agreement, Trustee shall be responsible for any loss or damage to the Signage except for ordinary wear and tear, as determined in Company's sole discretion. Trustee may not remove, disassemble or alter the Signage without the express written consent of Company. Trustee will immediately notify Company of any damage to the Signage. In the event Trustee removes, disassembles or alters the Signage in any way inconsistent with this Agreement, Trustee shall reimburse Company for its costs related to such Signage.

9.    **Term; Termination.**

(a)    This Agreement shall commence on the date this Agreement is executed by Company (the **"Effective Date"**) and shall continue as long as any Services attachment remains in effect (the **"Term"**).

(b)    Company may immediately terminate this Agreement, in whole or in part, if Company believes that (i) Trustee has breached the Agreement; (ii) Trustee has exceeded the authority granted under this Agreement; (iii) a material adverse change in Trustee's financial condition has occurred; (iv) Trustee may be violating Applicable Law; (v) Trustee's offering or selling of the Services would cause Company or any of its Affiliates to potentially violate or violate any Applicable Law or AML Requirements applicable to Company's Services; (vi) Company no longer offers or provides the applicable Services; (vii) Trustee has been inactive for 60 days or more or (viii) Company, as part of the process it conducts on agents and proposed agents, learns of any fact, circumstance or similar matter relating to Trustee that would adversely affect MoneyGram's business and reputation.

(c)    Upon expiration or termination of this Agreement for any reason Trustee agrees that:

(i)    Trustee shall immediately remit all Trust Funds and other amounts owing to Company;

(ii)    Trustee shall not be released from any obligation that accrued prior to the date of such termination, including the obligation of Trustee to pay Company for any and all obligations incurred under this Agreement;

(iii)    Trustee shall immediately remove or return to Company, as applicable, any remaining Supplies from all Agent Locations; and

(iv)    Trustee shall display at each Agent Location, for a period of at least ninety (90) days after termination, signs and materials provided by Company indicating that Trustee no longer offers the Services and listing the alternative locations at which consumers may access Company services.

10.    **Exclusivity. Additional Locations.**

(a) During the Term, the Parties acknowledge that, in addition to the Services, Trustee may offer other services similar to the Services provided pursuant to this Agreement. However, Trustee shall not, directly or indirectly, offer any of the products or services of Western Union similar to the Services (the "**Excluded Services**"), other than the services of the Western Union affiliate branded and marketed as VIGO and Orlandi Valuta. For a period of one-hundred-eighty (180) days following termination of this Agreement for any reason, Trustee will not offer or sell at any Agent Location any Excluded Services. Trustee acknowledges that its compensation during the Term of this Agreement is intended as consideration for any post-termination period.

(b) Trustee will not take any action or permit any action to be taken at an Agent Location, including dividing, subdividing or reconfiguring the space used to perform the Services in an attempt to narrow or circumvent the obligations contained in this Agreement. If during the Term Trustee acquires additional businesses or opens any additional locations, Trustee will cause such businesses or locations to provide the Services within 90 days after such acquisition or opening, subject to Company's approval, which approval shall be in Company's sole discretion. If Trustee is prohibited from causing such businesses or locations to provide the Services because of an agreement that existed prior to the date such businesses were acquired by Trustee, Trustee will terminate that pre-existing agreement as soon as termination would not constitute a breach under such agreement and thereafter will sell the Services at such businesses or locations. Trustee agrees to keep Company informed from time to time of all of Trustee's stores, businesses and locations and their respective ownership and to amend this Agreement as appropriate to accommodate the addition of such businesses or locations.

11. **Release of Information.** During the Term, Trustee agrees to provide either (a) regularly prepared financial statements (audited, if applicable) within thirty (30) days of such statements being prepared, or (b) federal and state income tax returns together with applicable schedules. In addition, Trustee shall provide all other relevant information and documentation satisfactory to Company at Company's request. Company may check Trustee's credit, credit reports, and references at any time. Trustee authorizes Company to receive and investigate such information, to make inquiries and to answer inquiries all without liability to Company.

12. **Financial Responsibility.** Trustee will maintain a sound financial condition and conduct its business so that in Company's judgment the Trust Funds are not at risk. Trustee will immediately stop providing or selling Services if Company determines in its sole discretion the financial condition of Trustee becomes unsound or the Trust Funds are at risk.

13. **Accounting.** Company shall, during the Term and until the later of (a) six (6) months after any termination of this Agreement, or (b) such date on which all amounts due and owing by Trustee to Company have been paid in full, have the right to audit and inspect Trustee's books and records relating to the Services and Trustee's compliance with this Agreement. Trustee will pay immediately (by cashier's check, certified check, or bank wire) all Trust Funds due Company as a result of any such audit and take immediate steps to insure compliance with this Agreement.

14. **Security Agreement.** Trustee grants to Company a continuing security interest in the Trust Funds, Trustee's cash that Company may hold at any time, Trustee's rights under this Agreement, Trustee's accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, inventory, investment property, letter-of-credit rights, letters of credit, and money, whether now owned or hereafter acquired, and all records relating to and all proceeds of all of the foregoing. This security interest secures all obligations of Trustee to Company. Any default by Trustee under this Agreement is a default under this security agreement. Company has all rights of a secured party under the Uniform Commercial Code. Trustee authorizes Company to file financing and continuation statements and amendments thereto. Trustee will take any action Company requests in order to perfect this security interest. Company satisfies its duty to exercise reasonable care in the custody of cash collateral by maintaining the cash collateral on deposit with a financial institution and retaining any income earned thereon. Company is not obligated to perfect or maintain this security interest.

15. **Right of Set-Off.** As partial security for Trustee's payment obligations to Company, including expenses of enforcement under this Agreement, Trustee consents and agrees that Company has the right of set-off for any amounts owed to Company against any amounts on deposit with, owing to or standing to the credit of Trustee on the books of Company. Regardless of the adequacy of any other remedy or rights of Company under this Agreement, if Trustee breaches any payment obligation to Company under this Agreement(or any other agreement to which Company and Trustee are both parties), Company may set-off any such amounts against any and all payment obligations of Trustee to Company then or thereafter existing, as determined by Company in its sole discretion, without notice to Trustee or compliance with any other condition precedent imposed by statute, rule of law, or otherwise, all of which are hereby expressly waived.

16. **Indemnification.** Trustee will reimburse, indemnify and hold harmless Company against all losses, claims, demands, actions, suits, proceedings or judgments, including costs, expenses and reasonable attorneys' fees with interest, incurred by Company as a result, in whole or part, of (a) Trustee's alleged breach or breach of this Agreement, (b) Trustee's negligence or willful misconduct, or (c) Trustee's acts or omissions in performing the Services. Trustee's indemnification obligations described above shall survive any termination of this Agreement.

17. **Reports.** Company shall periodically provide Trustee with access to reports and/or documentation (the "**Service Reports**") relating to Trustee's provision of Services (including Service Reports generated from the Equipment). Such Service Reports are presumed correct unless Trustee notifies Company in writing of an error within sixty (60) days after the date of the Service Report. Upon expiration of such sixty-day period, Trustee shall have the burden of proving any error in such Service Reports.

18. **Representations and Warranties.** Trustee warrants and represents the following: (a) Trustee's entering into this Agreement is not a breach of any other agreement to which Trustee is a party or by which Trustee is bound; (b) each person who signs below for a corporation, partnership, or other entity personally represents that he or she has the authority to bind the entity; (c) the execution, delivery,

and performance by Trustee of this Agreement has been duly authorized and is within Trustee's corporate, partnership, organizational or individual powers; (d) Trustee, if an entity, is in good standing under the laws of the state of its formation or organization; (e) Trustee has obtained, and will maintain throughout the Term, all permits and licenses necessary to operate Trustee's business in accordance with applicable federal and state laws, ordinances and regulations; (f) Trustee has never been investigated, restricted, suspended or terminated by any other entity with which Trustee had a contractual relationship or by governmental authority because of the suspicion or actually having been involved in any way with any fraudulent and/or suspicious financial activities and/or violations of the requirements set forth in the Legal Compliance section of this Agreement; (g) Trustee has never been convicted of any crime relating to dishonesty, fraud or financial crimes; (h) Trustee is not entering into this Agreement with the intention of engaging in fraudulent activities by offering the Services on its own or through a third party; (i) Trustee agrees that Company shall have the right to perform a criminal background check on Trustee and its owners at any time during the Term of this Agreement; and (j) that all information provided by Trustee to Company in connection with the offering of the Services, which includes but is not limited to information provided in this Agreement, an application, or any documents or records is correct and does not omit any material information. Trust acknowledges that Company is specifically relying on these representations as an inducement to enter into this Agreement.

19. **Insurance.** Trustee will maintain insurance covering theft or loss of the Trust Funds. Upon Company's request, Trustee will provide proof of insurance and a loss payable endorsement naming Company as a loss payee. Trustee hereby assigns insurance proceeds to Company to the extent necessary to pay amounts due Company.

20. **Notices.** All notices required or permitted under this Agreement must be in writing and shall be effective upon the earliest of (a) personal service; (b) two (2) business days after being sent by first class mail; (c) the next business day if sent by overnight courier within the United States; or (d) upon receipt of a facsimile confirmation. Notices to Company should be sent to: Contract Administrator, MoneyGram Payment Systems, Inc., 1550 Utica Avenue South, Suite 100, Minneapolis, MN 55416. FAX (952) 591-3485. Notices to Trustee should be sent to the address and/or FAX set forth in the application for agency appointment to the attention of the contact contained in such application or to the representative signing this Agreement.

21. **Settlement; Remittance.** Any and all amounts due Company, and the remittance method and schedule for all Trust Funds, shall be set forth on the applicable attachments. Unless otherwise agreed to in writing by Company, on each day in which Trustee is required to remit any amount to Company, Trustee shall provide to Company evidence that such remittance was made. Such evidence shall be in the form of the Deposit Validation Form, as provided by Company, and a deposit receipt documenting the deposit of Trust Funds and other amounts due Company specific to the Services offered and sold by Trustee. Such evidence shall be sent by Trustee by fax, email or other method agreed to by Company to ensure that Company receives the evidence no later than 1:00 p.m. Trustee's local time on the day it is to be delivered. Company may change the fees and remittance method or schedule from time to time with thirty (30) days' prior written notice to Trustee. If Trustee does not accept such changes, Trustee may, by written notice to Company within thirty (30) days of the effective date of the new fees and remittance method or schedule, give notice of termination specifying a date within sixty (60) days of Trustee's termination notice. Trustee authorizes Company to debit Trustee's Trust Account for any amount owed Company. If any remittance of Trust Funds or other payment by Trustee is not received by Company in full on or before the date due to Company, then Company may impose a one-time service charge not to exceed $75.00; and, if the remittance or other payment has not been received by Company in full on or before the date that is one banking day after the date due to Company, Company may charge interest on the outstanding amount of the remittance or other payment from the date due to Company until remitted or paid in full at the lesser of four percent (4%) above Prime and the highest rate allowable under applicable law. "Prime," as used herein, means the highest prime rate published in The Wall Street Journal at the date of determination, which rate thereafter shall change when and as such highest prime rate changes, all as determined by Company. Company's right to charge interest in this paragraph shall not (a) limit Company's ability to exercise all rights and remedies under this Agreement, including but not limited to terminating the Agreement, and (b) relieve Trustee from any liability for breach of the Agreement.

22. **Cross Guaranty.** Each individual or entity that has executed this Agreement shall be jointly and severally liable, and shall unconditionally guaranty the performance and obligation of every other individual or entity that has executed this Agreement.

23. **Assignment.** Trustee may not assign this Agreement or any of its rights hereunder to any person, including a successor in interest, by operation of law or otherwise, without the prior written consent of Company. Trustee shall notify Company in advance of the effective date of any change in ownership or Change of Control of Trustee, and Company may, at its option, terminate this Agreement effective upon the date of such change. In no event shall Trustee be relieved of its obligations or liability under this Agreement unless and until Company specifically releases Trustee from such obligations or liability in writing. Company may assign any of its rights or obligations under this Agreement without the consent of Trustee. This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, successors, assigns and personal representatives.

24. **Electronic Signatures.** This section shall apply in the event Company permits and Trustee consents to execute the Agreement by clicking the "I Agree", "Submit", "Accept" or equivalent indicator and each of the parties executes the Agreement by adopting an electronic signature via Company's authorized electronic signing system.

    (a)     The parties agree that this Agreement shall be effected by electronic means and understands that all electronic documents related hereto are legally binding in the same manner as are written documents when the information contained therein is sent or delivered in an electronic record capable of retention by the recipient at the time of receipt. An electronic record is not "capable of retention by the recipient" if the sender or its information processing systems inhibits the ability of the recipient to store or print the electronic record. To the extent applicable, this Agreement shall be governed by the Texas Uniform Electronic Transactions Act.

(b) Trustee understands that this Agreement may be executed by the interaction of an individual, acting on his or her behalf for another person, with Company's authorized electronic signing system (such interaction may occur as presented to the Trustee by an authorized Company representative and/or via a link sent to Trustee's e-mail as provided to Company by Trustee), so long as the individual knows or has reason to know his or her actions will cause the electronic signing system to complete the performance of executing the Agreement. In the event, however, that Trustee has unintentionally submitted the executed Agreement because of an error made by the Trustee in dealing with the electronic signing system, and Trustee promptly notifies Company in writing that Trustee does not intend to be bound hereby, Company agrees that the Agreement erroneously submitted will be deemed null and void provided that Trustee has not begun offering Company's Services. It is understood and agreed that any offering or selling of the Company's Services shall bind Trustee to this Agreement, whether or not Trustee claims the electronically signed Agreement was submitted in error.

(c) The parties agree that electronically signing this Agreement does not prohibit the parties from dealing in non-electronic means with respect to other documents, signatures, or communications related to this Agreement.

25. **General Provisions.**

(a) Instructions. Trustee agrees to follow all of Company's reasonable instructions relating to this Agreement. Company may change the instructions from time to time.

(b) Governing Law. This Agreement shall be interpreted and construed in accordance with the laws of the State of Texas, without giving effect to its conflict of law rules.

(c) Venue; Submission to Jurisdiction. The venue for any action under this Agreement shall be in the State of Texas, whether or not such venue is or subsequently becomes inconvenient, and the parties consent to the jurisdiction of the courts of the State of Texas, County of Dallas, and the U.S. District Court, District of Texas.

(d) Notice of Certain Events. In addition to any notice obligations of Trustee hereunder, Trustee shall immediately give notice to Company upon (i) initiation of any bankruptcy action by or against Trustee; (ii) the death or disability of any officer or owner of Trustee or any Guarantor; (iii) any Change of Control (as defined below) of Trustee; (iv) any change in ownership of Trustee's business including but not limited to, disclosing and identifying for Company any new owners who hold a 5% interest or more in Trustee's business; (v) any investigations, suspensions or terminations initiated by any other entities or the government against Trustee because of the suspicion of, or actually having been involved in, fraudulent or suspicious financial activities and/or violations of the requirements set forth in the Legal Compliance section set forth herein; (vi) the appointment of a receiver, trustee, or similar officer of any property of the Trustee or Guarantor; (vii) the initiation of any action attempting to revoke or suspend any of Trustee's licenses by any Regulatory Body having authority over Trustee; (viii) any default (or notice of default) by Trustee under any material agreement to Trustee's business or any agreement relating to the borrowing of money (including any loan agreement, credit agreement or promissory note); and (ix) any criminal proceeding initiated against the Trustee, any owner or officer of Trustee, or any Guarantor. As used herein, a **"Change of Control"** means and is deemed to have occurred when (x) another person or entity (the **"Acquirer"**) acquires voting stock of Trustee in an aggregate amount so as to enable the Acquirer to exercise more than five percent (5%) (such applicable percentage herein called the **"Control Percentage"**) of the voting power of Trustee; (xi) an Acquirer acquires all or substantially all of the assets of Trustee; or (xii) a merger or consolidation occurs to which Trustee is a party, and the voting stock of the Trustee outstanding immediately prior to consummation of such merger or consolidation is converted into cash or securities possessing less than the applicable Control Percentage of the voting power of the surviving corporation.

(e) Waiver of Jury Trial; Personal Service; No Acceptance of Service. COMPANY AND TRUSTEE IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING INVOLVING THIS AGREEMENT. TRUSTEE WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, AT THE ADDRESS SET FORTH IN THE APPLICATION FOR AGENCY APPOINTMENT. NOTWITHSTANDING THE FOREGOING, NOTHING HEREIN SHALL BE CONSTRUED AS ALLOWING A PARTY TO ACCEPT SERVICE OF PROCESS FOR OR ON BEHALF OF THE OTHER PARTY AND TRUSTEE SPECIFICALLY ACKNOWLEDGES THAT IT IS NOT AUTHORIZED TO ACCEPT ANY SERVICE OF PROCESS ON BEHALF OF COMPANY.

(f) Severability; Waiver. If any provision of this Agreement is determined to be invalid or unenforceable to any extent by a court of competent jurisdiction, the remainder of the Agreement shall remain valid and enforceable to the fullest extent permitted by law. Waiver of any term or condition of this Agreement by either party hereto either expressly or by implication shall not constitute a modification of the Agreement and shall not prevent that party from again enforcing such term or condition in the future with respect to subsequent events. No failure on the part of either party hereto to exercise any right of termination hereunder shall be construed to prejudice any subsequent right of termination.

(g) No Third Party Beneficiary. This Agreement will not confer any rights, benefits or remedies upon any person other than the parties to this Agreement.

(h) Entire Agreement; Amendment; Counterparts. This Agreement reflects the entire agreement among the parties with respect to the subject matter hereof. All exhibits, attachments, schedules, and addenda are expressly made part of this Agreement as though completely set forth herein. All reference to this Agreement shall be deemed to refer and include this Agreement and all related

exhibits, attachments, schedules, and addenda. This Agreement supersedes any and all other oral or written agreements made relating to the subject matter hereof. No amendment, alteration or modification of this Agreement shall be effective unless it is in writing and is signed by duly authorized representatives of each party. This Agreement may be executed by the parties in counterparts, which taken together shall form one legal instrument.

(i)   Remedies; Injunctive Relief. All rights and remedies set forth in this Agreement are cumulative and non-exclusive, and each party further retains all other statutory and common law remedies provided by law. Each of the parties acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the parties agrees that the other party is entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement in any action instituted in any court of the United States or any state having jurisdiction over the parties and the matter (subject to the provisions set forth in Section 25(c) above), in addition to any other remedy to which it may be entitled, at law or in equity.

(j)   Force Majeure. Neither party shall be liable to the other party for delays in the execution or completion of its obligations under this Agreement if such delay is caused by the occurrence of any contingency beyond its control, or beyond the control of its suppliers, including, but not limited to wars, insurrections, riots, or other acts of civil disobedience, acts of the public enemy, failure or delay in transportation, act of any government or agency or subdivision of any government or agency, judicial action, strikes or other labor disputes, accidents, fire, explosion, flood or storm, or other acts of God, shortage of labor, fuel, materials and machinery, technical failure, or other unforeseeable causes beyond its control, provided that written notice of such delay is presented within thirty (30) days of such delay, and that performance resumes following the cessation of the cause of the delay.

(k)   Suspension of Services. If, at any time, Trustee's offering and/or selling of the Service(s), in whole or in part, is reasonably likely to have an adverse effect on Company, Company may suspend, limit or restrict Trustee's ability to provide the Service(s) until the situation giving rise to such suspension has been resolved. This section shall not relieve Trustee of any obligation under this Agreement related to the cause or resolution of an event giving rise to Service suspension. If the parties are unable to resolve whether any action, or what action, is necessary to resolve such situation, Company shall have the right to immediately terminate this Agreement.

(l)   Taxes. Any taxes or fees imposed on the Services must be collected and remitted by Trustee. Trustee shall be responsible for any taxes levied on the Equipment, unless otherwise prohibited by law.

(m)   Survival. The representations, warranties, covenants, indemnities and other agreements of the parties stated or implied by their terms to survive in this Agreement and the parties' obligations hereunder shall survive the execution and delivery and the termination or expiration of this Agreement.

The Parties have caused this Agreement to be executed by their duly authorized representatives as of the Effective Date.

TRUSTEE:

Legal Entity:   LUZ FASHIONS IMPORT AND SALES INC

Signature: LUZ MARY VALDES (Aug 27, 2014)

Printed Name:   LUZ MARY VALDES

Title:   President

COMPANY:

MoneyGram Payment Systems, Inc.

Signature:   Annette Moening

Printed Name:   Annette Moening

Title:   Partner Data Mgmt Analyst

Effective Date:   September 11, 2014

Confidential, 7-10-13                                          9

Process ID:        564158



Process ID:        564158

**PERSONAL GUARANTY AND INDEMNITY**
Legal - MGI 1006 (07/2013)

"**Guarantor**" means each person who signs below, jointly and severally.  To induce Company to enter into or to continue the Master Trust Agreement and any related attachment, exhibit, addendum or amendment (as the foregoing may be amended, supplemented, extended, restated or otherwise modified from time to time, collectively the "**Agreement**"), with Trustee, Guarantor absolutely, unconditionally and irrevocably guarantees the punctual performance of all obligations of every kind, nature or description of Trustee, whether now existing or hereafter arising, under the Agreement.  Guarantor further agrees to reimburse, indemnify and hold Company harmless against all losses, claims, demands, actions, suits, expenses and damages (including loss of or damage to Equipment and reasonable collection costs and attorneys' fees), with interest, incurred by Company as a result, in whole or in part, of (i) Trustee's breach of the Agreement, (ii) Trustee's acts or omissions in performing the Services, (iii) enforcement of this Guaranty against any Guarantor, or (iv) any failure of any Guarantor to fully and timely perform the obligations as Guarantor hereunder.  Company or Company and Trustee may amend, supplement, extend, restate or otherwise modify the Agreement without notice to Guarantor and without effect on Guarantor's obligations hereunder.  Guarantor expressly waives all other notices and demands of any kind and description relating to the obligations now or hereafter provided for by this Guaranty, by the Agreement, or by any statute, law, rule or regulation.  Guarantor waives all defenses based on suretyship or impairment of collateral.  Each Guarantor guarantees the obligation of each Trustee who is a party to the Agreement and of every other Guarantor.  Company may enforce this Guaranty against any Guarantor whether or not Company takes any action against Trustee or any other Guarantor.  Guarantor waives to the fullest extent possible all claims Guarantor may have against Trustee arising out of any performance or payment by Guarantor to Company of any obligation under this Guaranty including without limitation all such claims of Guarantor arising out of any right of subrogation, indemnity, reimbursement, contribution, exoneration, payment or other claim, cause of action, right or remedy against Trustee whether arising at law, in equity, out of any agreement between Guarantor and Trustee, or otherwise.  This Guaranty may be terminated only with Company's written consent.  The venue for any action under this Guaranty shall be in the State of Texas, whether or not such venue is or subsequently becomes inconvenient, and Guarantor consents to the jurisdiction of the courts of the State of Texas, County of Dallas, and the U.S. District Court, District of Texas.  Guarantor hereby authorizes Company to check Guarantor's credit, credit reports, and references at any time, including without limitation after a breach of this Agreement by Trustee.  All required Guarantors must sign this Personal Guaranty and Indemnity within thirty (30) days after the effective date of the Agreement or Company may at any time terminate the Agreement immediately by oral or written notice.

Guarantor Signature: _LUZ MARY VALDES (Aug 27, 2014)_____    Printed Name: **LUZ MARY VALDES**

Home Address: 150 NE 26 DR                                        HOMESTEAD                    FL      33033

☑ I personally witnessed the above signature.              MGI Sales/Notary
                                                           Signature: ____Charlie Mendoza (Aug 27, 2014)_____
☐ I did not personally witness the above signature.

Guarantor Signature: _____    Printed Name: _____

Home Address: _____

☐ I personally witnessed the above signature.             MGI Sales/Notary

☐ I did not personally witness the above signature.        Signature: _____

Guarantor Signature: _____    Printed Name: _____

Home Address: _____

☐ I personally witnessed the above signature.             MGI Sales/Notary

☐ I did not personally witness the above signature.        Signature: _____

Guarantor Signature: _____    Printed Name: _____

Home Address: _____

☐ I personally witnessed the above signature.             MGI Sales/Notary

☐ I did not personally witness the above signature.        Signature: _____







**MONEY TRANSFER ATTACHMENT**
Legal- MGI 1001 (11/2012)

Process ID:    564158

**A.    Incorporation; Authorization; Certain Definitions.**  This Money Transfer Attachment by and between Trustee and Company (the "**MT Attachment**") authorizes Trustee to sell the Company's Money Transfer Services at the Agent Locations.  This MT Attachment is a part of and incorporated into that certain Master Trust Agreement by and between Trustee and Company.  Terms used and not defined in this MT Attachment are as defined in the Master Trust Agreement.  As used herein, "**Money Transfer Services**" means the Transfer Send, Transfer Receive, ExpressPayment and other bill payment or similar services offered by Company under the trade name *MoneyGram®* or any other trade name or service mark Company may designate;  "**Transfer Send**" means the transactional segment of Money Transfer Services wherein Trustee collects the Transfer Amount and the Consumer Fee from a consumer and initiates an electronic request to Company to disburse funds; "**Transfer Receive**" means the transactional segment of Money Transfer Services wherein Trustee receives a request from Company to disburse funds; "**ExpressPayment**" means the Company's bill payment service pursuant to which consumers may pay bills at Agent Locations for credit to billers with whom Company has contracted; "**Transfer Amount**" means the funds collected from a consumer for purposes of being transferred to a recipient or biller, excluding all fees; and "**Consumer Fee**" means the variable fee, set by Company, which Trustee shall collect from each consumer sender for the Money Transfer Services and/or Company's ExpressPayment services.

**B.    Money Transfer Supplies.**  As part of the Supplies, and if applicable based on the type of settlement option selected below, the Company shall provide Trustee with its standard company money orders (the "**DeltaGrams**").  Upon delivery of such DeltaGrams, Trustee shall sign the delivery receipt and immediately return such receipt to Company.

**C.    Money Transfer Procedures.**

 i.    Each time Trustee desires to conduct a Money Transfer Service transaction, unless otherwise agreed by Company, Trustee shall provide to Company an Identification Number and a PIN.  As used herein, "**Identification Number**" shall mean the unique and confidential identification number provided by Company to Trustee and "**PIN**" shall mean a second confidential identification number provided by Company to Trustee.

 ii.    The Identification Number and the PIN shall be collectively referred to as the "**Numbers**".  It is Trustee's obligation to ensure that its Numbers are kept confidential.  Trustee agrees to take all precautions necessary to prevent disclosure of and access to the Services by unauthorized persons and will notify Company immediately if Trustee knows or suspects that the Numbers have been disclosed.  In such event, Company will issue new Numbers to Trustee.  Trustee shall be fully responsible and unconditionally liable for all use or misuse of its Numbers (or transactions verified by Company on Trustee's behalf that did not use the Numbers) and shall assist Company in investigating the circumstances of such use or misuse.  The Numbers may be changed if their security has been compromised.  Trustee acknowledges that the Company will refuse to authorize transactions if the correct Numbers are not provided.

 iii.    Trustee agrees to take such actions as reasonably requested by Company to prevent fraudulent Transfer Send and/or Receive transactions.  Trustee agrees that Company shall have the sole and exclusive right, at any time, to refuse any Transfer Send or Transfer Receive request.

**D.    Transfer Send Transactions.**

 i.    For each Transfer Send, Trustee shall collect from the consumer the Transfer Amount and the applicable Consumer Fee(s).  Company shall provide Trustee a Consumer Fee schedule, which Company may from time to time amend in its sole discretion.  Trustee shall not charge consumers additional fees of any kind or nature.

 ii.    As payment for the Money Transfer Services, Trustee shall accept from consumers either (i) cash or (ii) such other forms of payment specifically approved by Company.  Trustee's acceptance of any other form of payment is at Trustee's sole and exclusive risk and Trustee shall be liable to Company for the Trust Funds related to any Transfer Send initiated by Trustee, regardless of whether Trustee ultimately receives good funds from the consumer.

**E.    Transfer Receive Transactions.**

 i.    Trustee shall follow the computerized or telephonic authorization procedures specified by Company prior to disbursement of any Transfer Receive.

 ii.    Trustee shall maintain the ability to disburse at least $300 in cash for each Transfer Receive.  Unless Trustee has selected Net Settlement Option 2 or Net Settlement Option 3 (as described below), if a Transfer Receive involves an amount which exceeds that amount or if the recipient requests disbursement in a form other than cash, Trustee will disburse the Transfer Receive amount by issuing a DeltaGram to the recipient, or in such other form as approved by Company.  Trustee shall not charge a fee of any kind for cashing a DeltaGram issued by Trustee in connection with a Transfer Receive.  DeltaGrams provided by Company to Trustee are not to be used for any purpose other than the Money Transfer Services.  If Trustee has selected Net Settlement Option 2 or Net Settlement Option 3, Trustee is responsible for paying the entire Transfer Receive in cash and Trustee will not be provided DeltaGrams.

 iii.    Trustee is fully responsible and unconditionally liable for all amounts which Trustee, pursuant to a Transfer Receive, wrongfully disburses either to a person other than the intended recipient or as a result of paying out an incorrect amount.

F. **MT Commissions.**

    i.   Company agrees to pay Trustee as compensation the following commission (the "**MT Commission**"):

        (a)            Percent (     ) of the applicable Consumer Fee for each Transfer Send; and

        (b)            Percent (  ..... ) of the applicable Consumer Fee for each Transfer Receive.

    ii.   The MT Commission shall be paid according to the settlement option selected in Section G below.

    iii.   Trustee shall cause each of its Agent Locations within the market area(s) in which Company is conducting a price promotion to participate in each such price promotion for its duration. During Company price promotions, MT Commissions paid to Trustee will be based upon the promotional Consumer Fee specified by Company. Company has the right in its sole discretion to determine when to use price promotions or other marketing programs that may involve a reduction in Consumer Fees. Trustee expressly understands that price promotions may result in reduced per transaction commissions.

G. **Remittances/Settlement.** Settlement of all amounts either owed to Trustee or to the Company, as applicable, as a result of the performance of the Money Transfer Services shall occur by either Standard Settlement or Net Settlement, as each are described below. Each party shall bear its own costs with respect to settlement option described below, including the cost of wire transfers and any intermediary bank charges.

    i.   ☐  **Standard Settlement (Check Here if Standard Settlement applies)**

        Trustee shall remit to Company via ACH debit from the Trust Account all Trust Funds associated with the Money Transfer Services on daily basis no later than the first business day after the applicable Money Transfer Services were performed. Trustee shall deposit DeltaGrams in the amount of each Transfer Receive transaction paid out in cash in order to itself receive reimbursement for cash disbursed. Company agrees to pay Trustee its MT Commissions by check or ACH credit to the Trust Account, by the 10th day of the calendar month following the month in which the Services were rendered.

    ii.   ☑  **Net Settlement (Check Here if Net Settlement Applies AND select applicable option below).**

        Trustee shall remit to Company by ACH debit from the Trust Account the applicable Net Payable Amount (as defined below) for Money Transfer Services on a daily basis, no later than the first business day after the applicable Money Transfer Service, or according to such other schedule as Company may specify. If the Net Payable Amount is due Trustee, Company shall initiate the credit of the Net Payable Amount for Money Transfer Services to the Trust Account.

        (a)      **Net Settlement Option 1**      Trust Funds associated with Transfer Sends and MT Commissions netted daily (Transfer Receives paid by DeltaGram).

        As used in Net Settlement Option 1, the "**Net Payable Amount**" for Money Transfer Services is the difference between (i) the total of all Trust Funds associated with Transfer Sends due to Company and (ii) the MT Commissions due to Trustee. All other amounts due Trustee for the performance of Money Transfer Services, including reimbursement of any cash disbursed by Trustee pursuant to a Transfer Receive or a refund transaction, shall be settled daily by Trustee printing a DeltaGram.

        (b)      **Net Settlement Option 2**      All Trust Funds associated with Money Transfer Services, Transfer Receives and MT Commissions netted daily.

        As used in Net Settlement Option 2, the "**Net Payable Amount**" for Money Transfer Services is the difference between; (i) the total of all Trust Funds and other amounts due to Company and (ii) the total of all Transfer Receives, MT Commissions and other amounts due to Trustee.

        (c)     ☑  **Net Settlement Option 3**      All Trust Funds associated with Money Transfer Services and Transfer Receive amounts netted daily; MT Commissions paid monthly).

        As used in Net Settlement Option 3, the "**Net Payable Amount**" for Money Transfer Services is the difference between (i) the total of all Trust Funds due to Company and (ii) the cash disbursed by Trustee pursuant to a Transfer Receive or refund transaction. Commissions shall be paid by check or ACH credit to the Trust Account, by the 10th day of the calendar month following the month in which the Money Transfer Services were rendered.

H.  **Liability for Loss of DeltaGrams.** Trustee shall be absolutely and unconditionally liable to Company for the face amount of any DeltaGram in all circumstances including where such DeltaGrams are lost, stolen, misappropriated, seized, forfeited or otherwise used by Trustee in a manner not authorized by this Agreement and subsequently paid by Company.  Company shall assume all responsibility for raised or counterfeited DeltaGrams unless the act or omission of Trustee, its agents or employees contributed to the raising or counterfeiting.

I.  **Term/Termination.**

    i.   This MT Attachment shall commence on the date that it is executed by the Company and shall end five (5) years thereafter (the "**Initial Money Transfer Term**").  Upon expiration of the Initial Money Transfer Term, this MT Attachment shall be subject to automatic successive renewals of one (1) year terms (each a "**Renewal Money Transfer Term**", unless either party notifies the other of its election to terminate the MT Attachment at least one hundred and eighty (180) days prior to the expiration of the Initial Money Transfer Term or any Renewal Money Transfer Term.

    ii.   Trustee Agrees to cooperate with Company during the Post Termination Transition Period.  As used herein, the "**Post Termination Transition Period**" shall commence on the effective date of any termination of this MT Attachment and shall end ninety (90) days thereafter.  During the Post Termination Transition Period Trustee agrees to (a) post signs provided by Company notifying MoneyGram customers of Trustee's termination and (b) provide its customers with reasonable information and assistance (as provided by Company) regarding Company's services.  Trustee acknowledges that is compensation during the Initial Money Transfer Term or any Renewal Money Transfer Term, as applicable, is intended to compensate Trustee for the post-termination period and that the restriction is reasonable.

J.  **Early Termination Fees.** If this MT Attachment is terminated (i) by Trustee for any reason or (ii) by Company due to Trustee's breach of the Agreement at any time prior to the expiration of the Initial Money Transfer Term or any applicable Renewal Money Transfer Term, Company may in its sole discretion assess as an early termination fee (the "**Early Termination Fee**") an amount equal the amount determined by multiplying (i) the average monthly Consumer Fees collected per Agent Location during the one-hundred eighty (180) days preceding the date of early termination (the "**180-Day Period**"), less the actual Transfer Send Commissions paid during such 180-day period, and (ii) the number of Agent Locations, and then multiplying such amount by the number of months remaining in the Initial Money Transfer Term or Renewal Money Transfer Term (as applicable), plus an amount equal the amount determined by multiplying (i) the average monthly Consumer Fees collected at any location anywhere on every Transfer Receive paid out by Agent, either at any Agent Location during the 180-Day Period, less the actual Transfer Receive Commissions paid on such amount during the 180-Day Period, and (ii) the number of months remaining in the Initial Money Transfer Term or Renewal Money Transfer Term (as applicable).  The parties agree that the Early Termination Fee is not a penalty but is a charge to compensate Company for Trustee's failure to satisfy its commitments during the Initial Money Transfer Term or a Renewal Money Transfer Term (as applicable) and that the Early Termination Fee is an agreed upon amount of liquidated damages necessary because the actual amount of damages that Company may suffer in the event Trustee terminates the Agreement prior to the expiration of the Initial Money Transfer Term or a Renewal Money Transfer Term (as applicable) are not easily determined.

The parties have caused this MT Attachment to be executed by their duly authorized representatives as of the Effective Date below.

**TRUSTEE:**

Legal Entity:  **LUZ FASHIONS IMPORT AND SALES INC**

Signature:  _____

Printed Name:  **LUZ MARY VALDES**

Title:  **PRESIDENT**

**COMPANY:**

MoneyGram Payment Systems, Inc.

Signature:  _Annette Moening_

Printed Name:  Annette Moening

Title:  Partner Data Mgmt Analyst

Effective Date:  _September 11, 2014_

"Exhibit B"

Confidential Communications

Summary of Statement of Account

| | Date | Advice # | Amount | Explanation of advice |
|---|---|---|---|---|
| A. | 06/23/15 | 86242540 | $2,015.80 | Debit to agents account was due to the return remittance of $2,015.80. This remittance was to pay for the express payments done for customers on 06/19/15. |
| B. | 06/23/15 | 86255771 | $4,402.29 | Debit to agents account was due to the return remittance of $4,402.29. This remittance was to pay for the express payments done for customers on 06/20/15. |
| C. | 06/24/15 | 86292017 | $1,997.49 | Debit to agents account was due to the return remittance of $1,997.49. This remittance was to pay for the wire transfers & express payments done for customers on 06/22/15. |
| D. | 06/25/15 | 86314105 | $5,004.84 | Debit to agents account was due to the return remittance of $5,004.84. This remittance was to pay for the wire transfers & express payments done for customers on 06/23/15. |
| E. | 06/26/15 | 86335956 | $4,836.86 | Debit to agents account was due to the return remittance of $4,836.86. This remittance was to pay for the wire transfers & express payments done for customers on 06/24/15. |
| F. | 06/29/15 | 86361036 | $4,980.93 | Debit to agents account was due to the return remittance of $4,980.93. This remittance was to pay for the wire transfers & express payments done for customers on 06/25/15. |
| G. | 06/30/15 | 86389212 | $4,957.79 | Debit to agents account was due to the return remittance of $4,957.79. This remittance was to pay for the wire transfers & express payments done for customers on 06/26/15. |
| H. | 06/30/15 | 86398591 | $5,077.65 | Debit to agents account was due to the return remittance of $5,077.65. This remittance was to pay for the wire transfers & express payments done for customers on 06/27/15. |
| I. | 06/30/15 | 86415002 | $4,031.44 | Debit to agents account was due to the return remittance of $4,031.44. This remittance was to pay for the wire transfers & express payments done for customers on 06/28/15. |
| J. | 07/01/15 | 86434325 | $4,753.87 | Debit to agents account was due to the return remittance of $4,753.87. This remittance was to pay for the wire transfers & express payments done for customers on 06/29/15. |

Confidential Communications

K.  07/02/15   86456486   $4,979.79      Debit to agents account was due to the return remittance of $4,979.79.  This remittance was to pay for the wire transfers & express payments done for customers on 06/30/15.

L.  07/03/15   86488537   $4,950.66      Debit to agents account was due to the return remittance of $4,950.66.  This remittance was to pay for the wire transfers & express payments done for customers on 07/01/15.

M.  07/06/15   86522828   $4,999.66      Debit to agents account was due to the return remittance of $4,999.66.  This remittance was to pay for the wire transfers & express payments done for customers on 07/02/15.

N.  07/07/15   86540238   $5,000.41      Debit to agents account was due to the return remittance of $5,000.41.  This remittance was to pay for the wire transfers & express payments done for customers on 07/03/15.

O.  07/07/15   86564350   $4,948.96      Debit to agents account was due to the return remittance of $4,948.96.  This remittance was to pay for the wire transfers & express payments done for customers on 07/04/15.

P.  07/07/15   86569933   $4,022.95      Debit to agents account was due to the return remittance of $4,022.95.  This remittance was to pay for the wire transfers & express payments done for customers on 07/05/15.

Q.  07/08/15   86588348   $5,081.21      Debit to agents account was due to the return remittance of $5,081.21.  This remittance was to pay for the wire transfers & express payments done for customers on 07/06/15.

R.  07/09/15   86609196   $5,087.90      Debit to agents account was due to the return remittance of $5,087.90.  This remittance was to pay for the wire transfers & express payments done for customers on 07/07/15.

S.  07/10/15   86634730   $5,100.00      Debit to agents account was due to the return remittance of $5,100.00.  This remittance was to pay for the wire transfers & express payments done for customers on 07/08/15.

T.  07/13/15   86665895    $279.93       Debit to agents account was due to the return remittance of $279.93.  This remittance was to pay for utility bill payments taken for customers on 07/09/15.

Confidential Communications

U. 07/13/15    86666260    $4,695.50    Debit to agents account was due to the return remittance of $4,695.50. This remittance was to pay for the wire transfers done for customers on 07/09/15.

V. 07/14/15    86690528    $5,071.17    Debit to agents account was due to the return remittance of $5,071.17. This remittance was to pay for the wire transfers & express payments done for customers on 07/10/15.

W. 07/14/15    86707548    $4,859.55    Debit to agents account was due to the return remittance of $4,859.55. This remittance was to pay for the wire transfers & express payments done for customers on 07/11/15.

X. 07/14/15    86714583    $182.47    Debit to agents account was due to the return remittance of $182.47. This remittance was to pay for utility bill payments taken for customers on 07/11/15.

Y. 07/14/15    86724518    $5,100.00    Debit to agents account was due to the return remittance of $5,100.00. This remittance was to pay for the wire transfers done for customers on 07/12/15.

Z. 07/15/15    86741658    $4,917.34    Debit to agents account was due to the return remittance of $4,917.34. This remittance was to pay for the wire transfers & express payments done for customers on 7/13/15.

AA. 07/15/15    86744604    $162.91    Debit to agents account was due to the return remittance of $162.91. This remittance was to pay for utility bill payments taken for customers on 07/13/15.

AB. 07/16/15    86765035    $5,067.95    Debit to agents account was due to the return remittance of $5,067.95. This remittance was to pay for the wire transfers & express payments done for customers on 7/14/15.

AC.    Audit fee    $75.00    Debit to agents account is an audit fee.

AD. 08/10/15    Commission    ($175.29)    Credit to agents account was due to commissions earned for the month of July 2015.

AE. 08/12/15    Equipment    $1,065.00    Debit to agents account was due to non-return of Money Transfer equipment. The agent is responsible for returning this equipment to have credit issue to the balance due.

"Exhibit C"

Filing # 37628123 E-Filed 02/10/2016 10:13:30 AM

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CASE NUMBER: 16-001966-CA-01**

**MONEYGRAM PAYMENT SYSTEMS, INC.,**
**a foreign corporation,**

**Plaintiff,**

v.

**LUZ FASHIONS IMPORT AND SALES, INC.,**
**A Florida Corporation and LUZ MARY VALDES,**
**individually,**

**Defendants.**

_____/

## AMENDED COMPLAINT FOR DAMAGES

Plaintiff, MONEYGRAM PAYMENT SYSTEMS, INC., (hereinafter referred to as "Plaintiff" or "MoneyGram"), by and through undersigned counsel, hereby sues Defendants LUZ FASHIONS IMPORT AND SALES, INC. and LUZ MARY VALDES, and alleges the following:

### Jurisdiction and Venue

1.    This is an action for damages in excess of $15,000, exclusive of interest, costs and attorneys' fees.

2.    At all times material to the allegations in this Amended Complaint for Damages, Plaintiff is and was a foreign corporation authorized to and doing business in Miami-Dade County, Florida.

3.    At all times material to the allegations in this Amended Complaint for Damages, Defendant, Luz Fashions Import and Sales, Inc., (hereinafter "Luz Fashions") is and was a Florida corporation licensed to and doing business in Miami-Dade

County and has offices and/or maintains agents for the transaction of its customary business in Miami-Dade County, Florida.

4.  This Court has personal jurisdiction over Luz Fashions based on its principal place of business at 4212 East 4th Avenue, Hialeah, Florida 33013, in this jurisdiction of Miami-Dade County, Florida.

5.  At all times material to the allegations in this Amended Complaint for Damages, Luz Mary Valdes (hereinafter "Valdes") owned and operated Luz Fashions. Valdes is and was a resident of Miami-Dade County, Florida.

6.  This Court has personal jurisdiction over Valdes based on her residency at 150 N.E. 26th Drive, Homestead, Florida 33033, in this jurisdiction of Miami-Dade County, Florida.

7.  Venue in Miami-Dade County is proper over Luz Fashions and Valdes (collectively "Defendants") pursuant to Fla. Stat. §47.011 and Fla. Stat. §47.051.

## Factual Allegations

8.  Plaintiff hereby incorporates all allegations contained in Paragraphs 1-7 of the Amended Complaint for Damages as if fully set forth herein.

9.  Plaintiff contracts with persons and entities such as Defendants to provide services including, but not limited to, money transfer services and the sale of money orders to the general public (referred to collectively as the "Services"). Such persons or entities hold the funds collected from the sale of the Services for Plaintiff, earning fees from same.

10.  On or about September 11, 2014, Plaintiff entered into such a contract with Luz Fashions and Valdes, by and through a Master Trust Agreement (hereinafter the

2

"Agreement") dated September 11, 2014, and executed by Luz Mary Valdes, as President of Luz Fashions.

11. Pursuant to the Agreement, MoneyGram, as the "Company", authorized Luz Fashions, as "Trustee", to offer and sell the Services in consideration for MoneyGram's agreement to pay Luz Fashions a set fee or percentage fee of the monetary value of a particular Service. A true and correct copy of the Agreement is attached hereto as "Exhibit A" and incorporated herein by reference.

12. Under the Agreement, Luz Fashions agreed to hold in trust, for the benefit of MoneyGram, any and all proceeds related to the sale of the Services (the "Trust Funds") and to maintain a separate account to hold such Trust Funds:

"Trust Funds" are fees, face amounts of money orders, gift certificates, money transfer checks, principal amounts of utility bill payments and money transfers and all proceeds from the sale of the Services. Trustee agrees to hold Trust Funds in trust for Company and separate from Trustee's funds....Trustee shall maintain an account to hold the Trust Funds [the "Trust Account"]." *See Exhibit A, para. 2.*

13. Luz Fashions, further agreed in the Agreement that:

"Trustee will safeguard the Trust Funds and all Supplies [including blank instruments] with the highest degree of care and will take such precautions as a prudent Trustee would take to safeguard its own cash." *See Exhibit A, para. 5(a) and 6.*

and that:

"Trustee is liable to pay to Company all Trust Funds in all circumstances. Until good funds are received by the Company, Trustee is liable for any lost, missing or stolen Trust funds, whether or not Trustee is negligent or at fault and regardless of how the trust funds became lost, missing or stolen." *See Exhibit A, para. 5(b).*

14. In further consideration of the Agreement, Valdes executed and delivered a Personal Indemnity and Guaranty to MoneyGram ("the Guaranty") where she

3

personally, absolutely, unconditionally and irrevocably guaranteed the punctual performance of all obligations of every kind, nature and description of Trustee, whether now existing or hereafter arising, under the Agreement. A true and correct copy of the Guaranty is contained within and is a part of the Agreement.

15. As described above, pursuant to the Agreement, Luz Fashions was to hold the Trust Funds in trust for the benefit of MoneyGram. The Agreement required Luz Fashions to remit to MoneyGram, on a daily basis, all Trust Funds.

16. Defendants wrongfully withheld the Trust Funds due and owing by Defendants to MoneyGram.

17. Specifically, Defendants wrongfully withheld ONE HUNDRED SEVENTEEN THOUSAND FIVE HUNDRED THIRTY TWO AND 03/100 DOLLARS ($117,532.03) in breach of the Agreement and Guaranty, comprising proceeds from the sale of Services that were required to be deposited in the Trust Account pursuant to the Agreement, as well as audit and return fees, as further set forth in the Summary of Statement of Account, *See Exhibit B, Summary of Statement of Account*. A copy of the Summary Statement of Account is incorporated herein by reference and is a verified account representing a liquidated money demand based upon the Agreement for the Services that MoneyGram provided to Luz Fashions, for public sale, and on which a systematic record has been kept.

18. As set forth in the Agreement, Defendants represented to MoneyGram that Luz Fashions would dutifully deposit the Trust Funds into the Trust Account.

19. MoneyGram reasonably relied on Defendants' representations in permitting Luz Fashions to hold the Trust Funds in the Trust Account. Through these

4

representations, Luz Fashions obtained and retained at least $117,532.03 from the sale of the Services.

20.    MoneyGram fully performed its obligations under the Agreement with Luz Fashions by paying Luz Fashions the contractual set fee or percentage fee of the monetary value associated with each particular Service sold by Luz Fashions.

21.    By correspondence dated July 20, 2015 and October 30, 2015, true and correct copies of which are attached hereto as Composite Exhibit C and incorporated herein by reference, MoneyGram demanded payment of the Trust Funds from Defendants. Despite written demand, Defendants have failed and refused and continue to fail and refuse to pay to MoneyGram the Trust Funds in the amount of $117,532.03.

22.    Defendants have failed and refused, and continue to fail and refuse, to pay MoneyGram the Trust Funds in the amount of at least $117,532.03.    All conditions precedent to MoneyGram's right to receive payment from Defendants have been performed or have occurred.

## Count I – Breach of Contract (Luz Fashions)

23.    MoneyGram incorporates the allegations contained in paragraphs 1 through 22 of the Amended Complaint for Damages as if fully set forth herein.

24.    By virtue of the Agreement and Guaranty entered into by and between MoneyGram and Defendants, described in detail above, MoneyGram is entitled to payment of the Trust Funds by Defendants.

25.    MoneyGram provided the Services required by the Agreement. Luz Fashions sold said Services and obtained proceeds from same. However, Luz Fashions

5

has failed and refused, and continues to fail and refuse, to deposit the Trust Funds to the Trust Account as required by the Agreement.

26. Likewise, Defendants have failed and refused, and continue to fail and refuse, to reimburse MoneyGram for the Trust Funds and otherwise perform their obligations under the Agreement as required by the Guaranty.

27. Defendants' failure to pay the sums due to MoneyGram constitutes a breach of the Agreement and Guaranty, respectively, and is the direct and proximate cause of actual and consequential damages to MoneyGram in the sum of at least $117,532.03.

28. All conditions precedent to contract formation and to Defendants' liability for breach of contract have been performed or have occurred. In the alternative, and without waiving the foregoing, MoneyGram's duty to perform such conditions precedent has been superseded, waived and excused by Defendants' wrongful conduct, as described herein.

29. In the alternative, should Defendants attempt to assert that they did not agree to pay MoneyGram the proceeds from the sale of the Services, or that Defendants are otherwise not liable to MoneyGram, then MoneyGram alleges and would show that Defendants are estopped by Defendants' conduct and conduct by Defendants' agent(s) to deny the efficacy and binding force of Defendants' respective agreements and the representations, or Defendants' actions, in anyway contrary thereto.

30. Defendants' breach of contract has made it necessary for MoneyGram to place the Agreement Documents with the undersigned attorney for collection of the

6

money due to MoneyGram from Defendants. The Agreement Documents provide that Defendants agreed to pay attorneys' fees and court costs incurred by MoneyGram in the event an attorney was hired to collect the sums due.

31. In addition to and as a result of the facts described above, MoneyGram is entitled to recover from Defendants the reasonable attorneys' fees and court costs associated with prosecuting this lawsuit.

32. MoneyGram is entitled to interest on the sums due to MoneyGram from Defendants at the maximum rate of interest to which it is legally entitled.

## Count II – Breach of Contract (Valdes)

33. MoneyGram incorporates the allegations contained in paragraphs 1 through 22 And 24 through 33 of the Amended Complaint for Damages as if fully set forth herein.

34. Under the terms of the Guaranty, Valdes is liable to MoneyGram for the full amount owed to MoneyGram by Luz Fashions under the Agreement, including costs, interest and attorneys' fees.

35. Valdes has breached the Guaranty by failing to pay MoneyGram upon Luz Fashions' default.

36. MoneyGram has been damaged by Valdes' breach of the Guaranty.

30. Valdes breach of contract is the direct and proximate cause of actual and consequential damage to MoneyGram in the sum of at least $117,532.03 for      which MoneyGram hereby sues, as well as costs, interest and attorneys' fees.

**WHEREFORE**, Plaintiff, MONEYGRAM PAYMENT SYSTEMS, INC. respectfully requests:

7

A)    That upon filing this Amended Complaint, process issue from the Court upon the Defendants be served in accordance with the law, requiring them to answer;

B)    That Plaintiff be awarded judgment against Defendants in the amount of $117,532.03 with interest, based upon default of Defendants;

C)    That Defendants be required to pay all reasonable attorneys' fees incurred on behalf of Plaintiff as a result of this suit;

D)    That the costs of this cause be fully taxed to the Defendants, including all of Plaintiff's taxable litigation expenses incurred in the prosecution of this cause; and

E)    That this Court grant Plaintiff any such other and further relief as it deems just, equitable and proper.

Respectfully submitted this 10th day of February, 2016.


_/s/ Charles Andrew Tharp_____
Charles Andrew Tharp
Florida Bar No.: 0746134

**LEITER, BELSKY & THARP**
*Attorney for MoneyGram Payment Systems, Inc.*
707 S.E. Third Avenue, 3rd Floor
Ft. Lauderdale, FL 33316
954-462-3116 (Telephone)
954-761-8990 (Facsimile)
Atharp@lbtlegal.com

# "Exhibit D"

CFN: 20160440206 BOOK 30170 PAGE 1152
DATE:07/28/2016  12:18:48 PM
HARVEY RUVIN, CLERK OF COURT, MIA-DADE CTY

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT,
IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CASE NUMBER: 16-001966-CA-01**

MONEYGRAM PAYMENT SYSTEMS, INC.,
a foreign corporation,

                              **Plaintiff,**

v.

LUZ FASHIONS IMPORT AND SALES, INC.,
A Florida Corporation and LUZ MARY VALDES,
individually,

                              **Defendants.**
_____/

**FINAL JUDGMENT AGAINST LUZ FASHIONS
IMPORT AND SALES, INC. AND LUZ MARY VALDES**

THIS CAUSE having come before the Court on the Motion of MONEYGRAM
PAYMENT SYSTEMS, INC. ("Plaintiff") for Entry of a Final Judgment of Default on Liability
and Damages against LUZ FASHIONS IMPORT AND SALES, INC. and LUZ MARY
VALDES, as guarantor ("Defendants"), jointly and severally, and after entry of Default
against Defendants, and the Court, having considered the Motion, reviewed the file,
Affidavits of the Parties, and otherwise being fully advised in the premises, it is thereupon

ORDERED AND ADJUDGED:

1.      That Judgment shall be issued in favor of Plaintiff and against Defendants, jointly

        and severally, in the amount of **$123,201.40**, with interest accruing at the statutory

        rate, and Plaintiff shall recover that amount from Defendants.

2.      It is further ordered and adjudged that Defendants shall complete under oath Florida

CFN: 20160440206 BOOK 30170 PAGE 1153

**CASE NUMBER: 16-001966-CA-01**

Rule of Civil Procedure Form 1.977 (Fact Information Sheet - copy attached), including all required attachments and serve it on Plaintiff's attorney within 45 days from the date of this Final Judgment, unless the final judgment is satisfied or post judgment discovery is stayed.

3.    Jurisdiction of this case is retained to enter further orders that are proper for an award of Attorneys' Fees, for Execution and/or Garnishment, and to compel the Judgment debtor to complete form 1.977, including all required attachments, and serve it on the judgment creditor's attorney.

DONE AND ORDERED in Chamber at Miami, Miami-Dade County, Florida this ____ day of _____, 2016. LET EXECUTION ISSUE.

HONORABLE
CIRCUIT COURT JUDGE

Copies furnished to:     Luz Mary Valdes, individually and as President of Luz Fashions Import & Sales, Inc. - Defendants

Charles A. Tharp, Esq. - Counsel for Plaintiff

FINAL ORDERS AS TO ALL PARTIES
SRS DISPOSITION
NUMBER _____
THE COURT DISMISSES THIS CASE AGAINST
ANY PARTY NOT LISTED IN THIS FINAL ORDER
OR PREVIOUS ORDER(S). THIS CASE IS CLOSED
AS TO ALL PARTIES
                    Judge's Initials

2